UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TAMMY KING,

      Plaintiff,

      v.

SHERIFF CARMINE MARCENO,
IN HIS OFFICIAL CAPACITY AS
LEE COUNTY SHERIFF; DEPUTY
JAY BRETT, INDIVIDUAL
CAPACITY; DEPUTY MELQUIAS
OLIVO, INDIVIDUAL CAPACITY;
MILLENIUM PHYSICIAN GROUP,
LLC, FRANCISCO MARASIGAN,
KRISTIN GUSTIN,

      Defendants,

Case No. 2:24-cv-375-KCD-KRH

## ORDER

Plaintiff Tammy King allegedly visited Millennium Physician Group seeking help with her prescription regimen, but rather than leaving with medical advice, she was detained under Florida's Baker Act. The Baker Act provides statutory procedures for the involuntary examination and hospitalization of individuals with mental illness who pose a danger or are unable to care for themselves. Fla. Stat. § 394.463.[1]

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

The fallout from that visit brings the current dispute before the Court. Defendant Dr. Francisco Marasigan, the physician who signed King's commitment forms, moves for summary judgment on her remaining state-law claims for false imprisonment and intentional infliction of emotional distress. (Doc. 103.) He argues that his actions were legally justified and fall short of the extreme conduct required to sustain such torts. King counters that a jury must untangle the competing factual narratives surrounding her detention. (Doc. 115.)

## I. Background

Much of the narrative is common ground. The Court notes any disputed material facts where appropriate. In March 2023, King visited Millennium's Saint James City clinic for an appointment with nurse practitioner Kristin Gustin. King presented with a history of depression and ADHD and was seeking assistance with her prescription medications. During the consultation, King became emotional and admittedly cried. (Doc. 115 ¶ 4; Doc. 112-24 ¶ 13.) At this juncture, the accounts diverge. Gustin reported that King expressed suicidal ideation—specifically, a desire to drive her vehicle into a dump truck. King adamantly denies making any such threat, maintaining that she merely expressed reasonable sadness over recent life stressors. (Doc. 115 ¶¶ 4-5.)

Concerned by the interaction, Gustin consulted with Dr. Marasigan. She relayed King's medical history, emotional volatility, and alleged suicidal

statements. The clinic staff then called 911 to arrange for King to be transported to a mental health facility. While King maintains she voluntarily agreed to seek further evaluation and simply thought she was getting a ride, she remained at the clinic until a Lee County Sheriff's deputy arrived.

What happened next was chaotic, but the core facts involving Dr. Marasigan are undisputed. The deputy approached King and a physical altercation ensued in the clinic's restroom. The deputy forcibly removed King's purse, restrained her, and deployed pepper spray. King admits that no Millennium staff member, including Dr. Marasigan, was in the restroom, nor did they participate in any use of force.

Dr. Marasigan personally witnessed the physical confrontation between King and the deputy when it spilled out of the bathroom. Relying on this real-time observation of King's behavior, together with the information relayed by Gustin, Dr. Marasigan executed a Certificate of Professional Initiating Involuntary Examination—the standard document required to initiate a Baker Act hold. (Doc. 112-1.) On that form, Dr. Marasigan certified the core statutory prerequisites for involuntary commitment: that King appeared to suffer from a mental illness and posed a substantial likelihood of causing serious bodily harm to herself. (*Id.*)

Following the scuffle, the deputy removed King from the clinic and placed her in his patrol car. She was then transported to Park Royal Hospital.

## II. Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). We must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at *2. If the record is so one-sided that a party must prevail as a matter of law, summary judgment is appropriate.

The mechanics are straightforward. The moving party bears the initial burden. It must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must then step up, go beyond the pleadings, and point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019).

### III. Discussion

As mentioned, the case against Dr. Marasigan boils down to two state-law torts: false imprisonment and intentional infliction of emotional distress. Dr. Marasigan asks the Court to end the case here, arguing that the record establishes he acted appropriately as a matter of law. Because these two claims demand distinct analytical frameworks, the Court takes them up one at a time.

### A. False Imprisonment

Under Florida law, false imprisonment covers the unlawful restraint of a person against their will. "The tort's purpose is to protect personal freedom of movement by curtailing detention without color of legal authority, which occurs when there is an improper restraint [that] is not the result of a judicial proceeding." *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. Dist. Ct. App. 2015). False imprisonment has four elements: "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." *Id*.

To be clear, King does not argue that Millennium staff locked the doors or physically barred her from leaving the clinic. The record confirms she walked outside to smoke and made a phone call during the consultation. And King thought she was free to leave until the Baker Act occurred. (Doc. 101-5 King Dep. 183:24-184:5); *Escambia Cnty. Sch. Bd. v. Bragg*, 680 So. 2d 571,

572 (Fla. Dist. Ct. App. 1996) ("The tort of false imprisonment or false arrest is defined as the unlawful restraint of a person *against his will*[.]" (emphasis added).) The only detention attributable to Dr. Marasigan is the involuntary commitment he initiated. (*See* Doc. 114 at 11.)

The Baker Act grants extraordinary power to strip individuals of their liberty, but it does not provide absolute immunity from state tort law. "A false imprisonment claim can be asserted based on allegations that a person was involuntarily held without compliance with the Baker Act." *Thuan Viet Doan v. United States*, No. 18-21841-CIV, 2018 WL 4953353, at *3 (S.D. Fla. Oct. 12, 2018); *see also Whitcomb v. City of Panama City*, No. 5:13-CV-30-RS-EMT, 2013 WL 6859095, at *7 (N.D. Fla. Dec. 30, 2013) ("When a law enforcement officer takes a person into custody for involuntary examination pursuant to Section § 394.463, this encounter is an involuntary deprivation of liberty and thus must be lawful to withstand a claim for false imprisonment.").

To involuntarily commit someone under the Baker Act, the physician must have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to . . . herself or others in the near future, as evidenced by recent behavior." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021). Put simply, "an officer must have probable cause to believe the person is dangerous either to himself or

6

others." *Harrison v. City of Fort Lauderdale*, No. 17-61164-CIV, 2018 WL 9516029, at *4 (S.D. Fla. Dec. 21, 2018).

The problem for King is a straightforward one of evidence. Dr. Marasigan did not pull the Baker Act certification out of thin air. The record is undisputed that he acted on two concurrent pieces of information. First, Gustin informed him that King was emotionally unstable and had expressed a plan to commit suicide. Second, Dr. Marasigan personally observed King's behavior with the sheriff's deputy. These facts provided the justification needed for the Baker Act detention. *See Burgess v. Mayo*, No. 8:13-CV-2446-T-36AEP, 2014 WL 4373428, at *2 (M.D. Fla. Sept. 3, 2014). And that justification holds even if King was not in fact suicidal. *Id.* ("[E]ven if the Court were to . . . [assume the plaintiff] was not in fact suicidal, that does not undermine the reasonableness of the officers' perception as to probable cause.").

King tries to salvage her claim by arguing that the certification contained false information because she never expressed suicidal ideations. (Doc. 115 at 6.) The Court accepts King's denial as true at this stage. But that argument misses the mark. The legal inquiry does not turn on whether King actually made the statements, or even whether Gustin lied. Rather, the question is whether Dr. Marasigan possessed an objective, reasonable basis to act on the information presented to him at the time. *See Betancourt v. Sanchez*, No. 24-22121-CIV-WPD, 2025 WL 1841865, at *4 (S.D. Fla. May 28, 2025).

7

King offers no evidence to suggest that Dr. Marasigan was complicit in any alleged deception. And a physician does not forfeit his legal authority to initiate a mental health hold simply because the subordinate's report he relied upon is later disputed. *See Thompson v. Sch. Bd. of Osceola Cnty., Fla.*, No. 6:19-CV-1738-CEM-EJK, 2022 WL 21747337, at \*5 (M.D. Fla. Jan. 31, 2022) (noting that the presence of objective facts supporting a detention defeats an unlawful seizure claim even if the underlying information is ultimately proven false).

King also stresses that Dr. Marasigan "did no evaluation of [her] or even spoke to [her] prior to signing the form completed by Defendant Gustin." (Doc. 115 at 9.) But the undisputed record provides that doctors can, and routinely do, rely on information from others to make clinical decisions, including under the Baker Act. (Doc. 101-7 Marasigan Dep. 49:14-50:10.) King offers nothing to the contrary. And that evidentiary void is fatal since she bears the burden of showing a genuine issue for trial. Since King provides no evidence showing that Dr. Marasigan's clinical process was unlawful, she fails to strip him of his legal authority.

When a nurse reports that a patient is highly emotional, has a diagnosed mental health disorder, and is threatening to drive into a dump truck, a doctor can safely conclude that a Baker Act detention is warranted. *See Whitcomb*, 2013 WL 6859095, at \*7. And here, there is no dispute Dr. Marasigan received that report, nor is there any evidence he had reason to question its veracity

8

when he made his clinical decision. (Doc. 101-7 Marasigan Dep. 48:3-51:6.) Because King cannot demonstrate a lack of factual evidence regarding the potential harm as it was presented to Dr. Marasigan, his decision to initiate the hold was legally justified. The false imprisonment claim resulting from that decision thus fails as a matter of law.

## B. Intentional Infliction of Emotional Distress (IIED)

King's IIED claim also falls short. To be sure, she endured a traumatic ordeal. But to assess Dr. Marasigan's liability, the Court must isolate his specific conduct from the larger chaos of the afternoon. *See Hadley v. Perez*, No. 25-CV-22162, 2025 WL 2851643, at *20 (S.D. Fla. Oct. 8, 2025). Dr. Marasigan did not physically detain King, forcefully confiscate her purse, or deploy pepper spray. Nor does King allege that he conspired with the defendants who did. The sole misconduct attributable to Dr. Marasigan is that he authorized the Baker Act and sat idle while King was forcefully detained. (Doc. 115 at 12-13.)

"[L]iability for intentional infliction of emotional distress attaches only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1368 (11th Cir. 2024). "While there is no exhaustive or concrete list of what constitutes outrageous conduct, Florida common law has evolved an extremely high standard." *Chingarev v. Rambosk*,

9

No. 2:22-CV-494-KCD-NPM, 2025 WL 3767952, at *3 (M.D. Fla. Dec. 31, 2025). It is not enough to show that a defendant acted with tortious, or even malicious, intent. *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 955 (Fla. Dist. Ct. App. 2017).

Measured against that standard, Dr. Marasigan's actions fall far short of the line. Take the Baker Act authorization first. As detailed above, Dr. Marasigan relied on objective reports of suicidal intent from his staff and his own real-time observations of an escalating crisis. Exercising clinical judgment to secure emergency psychiatric care on those facts is the opposite of atrocious behavior. And even if his medical judgment was somehow flawed or negligent, "the rendering of substandard medical care does not constitute the intentional infliction of emotional distress." *Gonzalez-Jiminez De Ruiz v. United States*, 378 F.3d 1229, 1231 (11th Cir. 2004).That leaves his failure to intervene. King faults Dr. Marasigan for standing by while the deputy used excessive force. But he is a medical provider, not a police commander. He had no authority to direct, control, or call off law enforcement. Standing on the sidelines while a sworn officer handles a physical altercation might be intensely distressing to watch, but it is not the kind of extreme and outrageous conduct that Florida law punishes. *See Cortez v. Home Depot U.S.A., Inc.*, No. 12-CV-14177-KMM, 2013 WL 12077478, at *4 (S.D. Fla. Jan. 31, 2013). Because no reasonable jury

could look at Dr. Marasigan's specific conduct and label it intolerable in a civilized community, the IIED claim fails as a matter of law.

## IV. Conclusion

The law requires the Court to evaluate Dr. Marasigan's actions based on the objective information available to him at the clinic, not on the facts that developed since. *See Thompson*, 2022 WL 21747337, at *5. The undisputed record establishes that Dr. Marasigan invoked the Baker Act only after learning of King's alleged suicide threat and witnessing her fighting with a law enforcement officer. That foundation provided the requisite legal authority for his actions. And for those exact same reasons, his conduct falls far short of the extreme and outrageous behavior required to sustain an IIED claim. Accordingly, it is **ORDERED**:

1. Dr. Marasigan's Motion for Summary Judgment (Doc. 103) is **GRANTED** and the remaining claims against him (Counts VIII and XI) are **DISMISSED**.

2. The Clerk is directed to terminate Dr. Marasigan as a party. Because other claims remain pending against the surviving defendants, the Court will withhold judgment until the conclusion of the case. *See* Fed. R. Civ. P. 54(b).

**ENTERED** in Fort Myers, Florida on July 14, 2026.

Kyle C. Dudek
United States District Judge