UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TAMMY KING,

Plaintiff,

Case No. 2:24-cv-375-KCD-KRH

v.

SHERIFF CARMINE MARCENO, IN HIS OFFICIAL CAPACITY AS LEE COUNTY SHERIFF; DEPUTY JAY BRETT, INDIVIDUAL CAPACITY; DEPUTY MELQUIAS OLIVO, INDIVIDUAL CAPACITY; MILLENIUM PHYSICIAN GROUP, LLC, FRANCISCO MARASIGAN, KRISTIN GUSTIN,

Defendants.
_______________________________/

# ORDER

In 2023, a routine medical appointment took a distressing turn for Plaintiff Tammy King. After staff determined that she required an involuntary psychiatric evaluation under Florida's Baker Act, Lee County Sheriff's Deputies Jay Brett and Melquias Olivo were dispatched to transport her to a local hospital. What was supposed to be a medical transport quickly escalated into a physical confrontation. When King hesitated to hand over her purse, Deputy Brett shoved her against a wall, struggled to secure her hands, and deployed pepper spray into her face. The ordeal continued during the subsequent drive. Deputy Olivo allegedly placed a shackled King into the

seatbelt-less, unpadded metal compartment of a corrections van, where she was tossed about and injured.

King brought this lawsuit to hold the deputies accountable for her physical and psychological injuries. Following a series of voluntary dismissals (Doc. 101-1), the initial complaint has been pared down to a single claim for excessive force under 42 U.S.C. § 1983.[1]

Deputies Brett and Olivo (collectively "Defendants") now move for summary judgment. (Doc. 107.) They maintain that the force used to secure and transport King was objectively reasonable and, alternatively, they are entitled to qualified immunity. (*Id.* at 2.) King opposes the motion. (Doc. 113.)

## I. Background

At the summary judgment stage, the Court must view the evidence in the light most favorable to King and draw all reasonable inferences in her favor. *See Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *2 (M.D. Fla. Dec. 28, 2023). Because the parties present two sharply contrasting accounts of what occurred, the Court highlights those factual disputes where they arise.

The events start at the Millennium Physician Group clinic in Saint James City. King was experiencing significant personal stress and scheduled

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

an appointment to receive assistance with her medications. But clinic staff soon concluded she was experiencing a mental health crisis. Invoking Florida's Baker Act, the clinic initiated an involuntary psychiatric examination and dialed 911 to request transport.

Deputy Brett responded to the call. And here is where the stories first diverge. King insists she had agreed to a voluntary evaluation, knew nothing of the Baker Act paperwork, and was therefore not subject to involuntary commitment when the deputy arrived. Brett, by contrast, asserts that he arrived fully authorized to detain her. One detail, however, escapes dispute. The 911 caller requested transport for a Baker Act patient. (Doc. 67-1.) So that was the information Brett arrived on scene with.

Before leaving the clinic for the hospital, King asked to use the restroom. Brett permitted her to do so but followed her in. Noting that King carried a purse with visible pill bottles, Brett demanded she hand the bag over for safety reasons. A physical struggle ensued. Brett claims King refused his commands, actively resisted, and struck him in the chest with her hand. King tells a different story. While she admits refusing to surrender the purse, she denies that the deputy ever asked for it. She also denies striking the deputy, asserting instead that when she finally released the bag, the momentum caused it to hit his chest.

What happened next forms the crux of the first excessive force claim. Brett shoved King against the bathroom wall and secured her right wrist in a handcuff. When he could not immediately secure her left hand, Brett deployed pepper spray into King's face—three times, according to King. Brett claims the chemical spray was necessary to gain compliance because King ignored multiple verbal commands and physically resisted. King insists she was fully compliant, not resisting at all, and crying for help when she was sprayed and fell to the ground.

Once secured, Brett placed King in the back of his patrol vehicle to await a transport van. The parties fiercely dispute the conditions of this confinement. The deputies point to emergency medical service records indicating that King's eyes were flushed with saline, she was placed in an air-conditioned vehicle, and she exhibited no physical injuries. King counters that her decontamination consisted only of a wet rag that quickly fell off her face. She alleges she was left to suffer the burning effects of the spray for hours in a hot car, denied access to a bathroom, and forced to sit in her own urine.

Brett then drove King to a grocery store parking lot and transferred custody to Deputy Olivo, who operated a transport van. At the handoff, Brett told Olivo that she had been decontaminated from the pepper spray. But the factual disputes continue here. King alleges that Olivo secured her ankles in

shackles so tightly that they caused lasting bruises. Olivo denies using ankle restraints at all.

Olivo placed King into a metal cage in the back of the van. It is undisputed that the van was not equipped with seatbelts. During the approximately two-and-a-half-hour ride to the hospital, Olivo made two additional stops to pick up other detainees. King alleges she was violently thrown against the metal walls with every stop and turn, suffering multiple physical injuries. She also says that Olivo ignored her explicit pleas for help and medical attention. Olivo counters that the compartment was too small for King to be thrown around and maintains that she never reported any injuries during the trip.

The van eventually reached the hospital. Medical staff evaluated King, noting her complaints of burning eyes from the pepper spray, a small bump on her forehead, and a bruise from the handcuffs. Following her release, King filed this lawsuit. As mentioned, the complaint has been pared down to a single claim against the deputies for excessive force. (*See* Doc. 101-1.)

## II. Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30,

2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condominium Homes Condominium Association, Inc.*, 2023 WL 8978168, at *1. We must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 2. If the record is so one-sided that a party must prevail as a matter of law, summary judgment is appropriate.

The mechanics are straightforward. The moving party bears the initial burden. They must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must then step up, go beyond the pleadings, and point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019).

**III. Discussion**

Before addressing the merits of the excessive force claims against Brett and Olivo, a threshold issue requires attention: which constitutional amendment actually governs this dispute. The complaint invokes both the Fourth and Fourteenth Amendments. But the Constitution does not apply a

single standard to excessive force claims. *Graham v. Connor*, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."). Rather, the proper framework depends on where the plaintiff is located within the legal system.

When officers make an arrest, the Fourth Amendment's ban on "unreasonable searches and seizures" governs the encounter. *See Graham*, 490 U.S. at 394. At the other end of the timeline, the Eighth Amendment's prohibition against "cruel and unusual punishments" protects convicted prisoners. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). For those in the middle—so-called pretrial detainees—the Fourteenth Amendment's Due Process Clause steps in to bar the use of excessive force. *See Kingsley v. Hendrickson*, 576 U.S. 389, 393 (2015).

The distinction between these constitutional lanes is not just academic—it dictates exactly what a plaintiff must prove to survive summary judgment. Under the Fourth and Fourteenth Amendments, the inquiry is objective. A court asks only whether the officer's use of force was reasonable given the facts and circumstances on the ground. The Eighth Amendment, by contrast, sets a much higher hurdle. Because its text specifically targets "cruel and unusual punishments," a convicted prisoner must also prove that

the officer acted with a subjective culpable state of mind. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020).

Sorting out Brett's conduct is straightforward. He applied force while actively taking King into custody. Because his actions occurred during an initial seizure, the Fourth Amendment provides the governing framework. Olivo presents a trickier question. His alleged use of force—applying tight shackles and conducting a rough, unsecured transport—occurred only after King had been fully detained and transferred to his custody. Jumping on this timeline, Defendants argue that the initial seizure was complete and so the Fourteenth Amendment must control Olivo's conduct. (Doc. 107 at 22.)

The Court cannot agree. The Fourteenth Amendment is the domain of "pretrial detainee[s]." *Piazza v. Jefferson Cnty., Alabama*, 923 F.3d 947, 952 (11th Cir. 2019). Achieving that status generally requires a "judicial determination of probable cause" as a prerequisite to an extended restraint on liberty. *Bell v. Wolfish*, 441 U.S. 520, 536 (1979). King never reached that milestone. She was not taken into custody for committing a crime, but rather for a psychiatric evaluation. And while she was undeniably detained during transport to the hospital, it makes little sense to categorize her as a pretrial detainee when she was entirely outside the judicial process. *See, e.g.*, *Hicks v. Moore*, 422 F.3d 1246, 1254 n.7 (11th Cir. 2005). The governing doctrine only reinforces the point. When analyzing the Fourteenth Amendment in this

context, a court must "account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 576 U.S. at 397. Those institutional considerations fit perfectly within the walls of a jailhouse. They make no sense here.

Because Olivo's transport was a direct, uninterrupted continuation of the initial Baker Act seizure, the Fourth Amendment remains the proper constitutional standard for evaluating his actions as well. *See, e.g.*, *Albritten v. Dougherty Cnty., Ga.*, 973 F. Supp. 1455, 1459-60 (M.D. Ga. 1997).[2] The Court now turns to the merits. And because the two deputies played distinctly different roles in this encounter, their conduct is addressed separately below.

**A. Deputy Brett**

King tries to undermine Brett's defense right at the start, arguing he had no legal basis to seize her at all. (Doc. 113 at 11.) And if the seizure

[2] Taking Defendants' position would make no practical difference. An excessive force claim under the Fourteenth Amendment requires a purely objective analysis—just like a Fourth Amendment claim. *Kingsley*, 576 U.S. at 397. Because the test under either amendment asks only whether the officer's conduct was objectively reasonable, swapping the constitutional label would not alter the outcome here. *See Beavers v. City of Oneonta, Alabama*, No. 2:22-CV-00592-RDP, 2022 WL 14068942, at *6 n.4 (N.D. Ala. Oct. 24, 2022).

lacked a legal foundation, her logic goes, then the deputy had no authority to use any force. (*Id.*)

For starters, this theory is not cognizable here. "[A] claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000). King voluntarily dismissed her unlawful seizure claim, so she cannot now backdoor a false arrest argument into an excessive force claim. *See Williamson v. Mills*, 65 F.3d 155, 159 (11th Cir. 1995).

In any event, King's argument fundamentally misreads how the Fourth Amendment operates. Courts evaluate a seizure based on the information known to the officer at the time, not the facts unearthed in hindsight. *See King v. Miami-Dade Cnty.*, 725 F. Supp. 3d 1324, 1333 (S.D. Fla. 2024). When Brett arrived at the clinic, he knew what dispatch had relayed: a medical facility needed transport for a Baker Act patient. He was not sent to conduct his own Baker Act evaluation, nor was he instructed to wait around for signatures. And nothing in the record shows Brett was informed the Baker Act paperwork was incomplete. Armed with a clear directive from a medical provider, a reasonable officer in Brett's shoes would believe he had the legal authority to detain King if she refused to cooperate.

With that threshold question about the initial seizure sidelined, the Court must determine whether Deputy Brett's use of force crossed the constitutional line. The Fourth Amendment prohibits the use of "unreasonable" force during a seizure. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Reasonableness is not evaluated from the safety of judicial chambers. It is judged from the perspective of a reasonable officer on the scene, forced to make split-second decisions in tense and often rapidly evolving circumstances. *Graham*, 490 U.S. at 397. To measure whether an officer's actions were objectively reasonable, we look to the totality of the circumstances. This includes factors like the severity of the situation, whether the individual posed an immediate threat, and whether she was actively resisting. *Id.* at 396.

Even if an officer misjudges the amount of force required, qualified immunity can step in to shield him from liability. Qualified immunity protects government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine gives officers breathing room to make reasonable but mistaken

judgments, protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To overcome this formidable shield, a plaintiff must show not only that a constitutional violation occurred, but also that the right was so clearly established that every reasonable official would have understood his conduct was wrong. *Id.* at 741.

Applying this framework to the chaotic seconds inside the clinic bathroom, it's not easily discernible whether Brett went too far. On the one hand, King undeniably demonstrated resistance. By her own admission, she ignored Brett's commands and refused to hand over her purse—a bag that was open and contained visible prescription pill bottles. (*See* Doc. 112-24.) This is not a case where a deputy encountered a peaceful, fully compliant individual and responded with unprovoked force. Brett had a legitimate safety interest in securing the bag of an individual experiencing a mental health crisis before entering the bathroom. And once the physical struggle over the bag ensued, Brett had every justification to push King against the wall and attempt to secure her hands.

On the other hand, King claims that Brett deployed pepper spray into her face three times. And, critically, she alleges this force came after the deputy had already secured her right wrist in a handcuff. According to King, she was fully compliant at that moment, not actively resisting efforts to

secure her other arm. Using pepper spray on an individual who is partially restrained and no longer actively resisting presents a much closer constitutional question. "Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002). But "using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital." *Id.*

Thankfully the Court need not resolve whether Brett's use of force was excessive. Even assuming he should have stopped short of using the pepper spray, King's claim still fails at the second step of the analysis. "If the government official was engaged in a discretionary function," as is undisputedly the case here, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Frankes v. City of Boynton Beach*, No. 25-80396-CIV, 2026 WL 304399, at *5 (S.D. Fla. Feb. 5, 2026). King has not shown that Brett's conduct violated clearly established law.

"[T]he touchstone of qualified immunity is notice." *Bussey-Morice v. Gomez*, 587 F. App'x 621, 627 (11th Cir. 2014). "[I]t does not offer protection if an official knew or reasonably should have known that the action he took

within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003). "[T]he nub of the inquiry is whether the state of the law [at the time of the alleged violation] gave the officials fair warning that their [acts were] unconstitutional." *Id.*

A constitutional right can be clearly established in one of three ways. *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). "The plaintiff must point to either (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Watkins v. Fort Lauderdale Police Officer*, No. 24-11030, 2025 WL 902117, at *3 (11th Cir. Mar. 25, 2025). Only decisions of the United States Supreme Court, the Eleventh Circuit, "or the highest court in a state can clearly establish the law." *Crocker*, 995 F.3d at 1240. And when the plaintiff relies on a general rule to show that the law is clearly established, it must "appl[y] with obvious clarity to the circumstances." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007).

King clears none of these three hurdles. First, she points to no materially similar case finding a constitutional violation under these circumstances. The only decision she offers is *Borton v. City of Dothan*, 734 F.

Supp. 2d 1237 (M.D. Ala. 2010). (Doc. 113 at 16.) As a threshold matter, *Borton* is a district court case and thus cannot not serve as controlling precedent to put the deputies on notice. That aside, the critical distinction between the two cases lies in the plaintiff's level of restraint. In *Borton*, the court denied summary judgment after an officer repeatedly tased a patient experiencing a manic episode while she was being transported for mental health treatment. The *Borton* plaintiff, however, was completely restrained. She was strapped to a gurney with her wrists handcuffed and legs secured. *Borton*, 734 F. Supp. 2d at 1249-50. The court explained she was incapable of physically fighting with the officers, posed no threat to anyone, and presented no flight risk. King, by contrast, was only partially restrained in a clinic bathroom and had actively resisted by refusing to surrender her purse. Because King retained a degree of mobility and physical resistance that the fully incapacitated *Borton* plaintiff lacked, the cases are not factually similar.

Second, King cannot rely on a broad statement of principle. While the Fourth Amendment undeniably prohibits excessive force, that general rule does not apply with "obvious clarity" to the chaotic reality Brett faced inside the clinic. *Hughes v. Locure*, 166 F.4th 121, 128 (11th Cir. 2026). He was forced to make a split-second judgment about how to fully secure a non-compliant individual who had just physically struggled with him over her purse. "[P]epper spray is a very reasonable alternative to escalating a

physical struggle with an arrestee." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002). Because the bounds of proper force in this scenario remain unclear, the suitability of Brett's actions was not beyond debate. Where the law fails to provide clear lines, a general constitutional rule cannot supply the obvious clarity required to strip a deputy of qualified immunity. *See Hughes*, 166 F.4th at 128.

Finally, Brett's conduct does not fall into the narrow exception for obviously unconstitutional acts. This third path is reserved for the most extreme behavior that shocks the conscience—conduct so plainly unlawful that no officer could possibly think it was permissible. While pepper-spraying a partially restrained individual might present a close question on the merits, it is a far cry from the kind of unprovoked violence that strips an officer of qualified immunity in the absence of guiding case law. *See Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1292 (11th Cir. 2009).

King's qualified immunity analysis is entirely perfunctory. (Doc. 113 at 19.) That will not do. *See, e.g.*, *Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1185 (11th Cir. 2020) ("[I]n addition to proving a constitutional violation, the plaintiff must demonstrate that the law underlying his claim was clearly established at the time of the incident in question."). By offering only a superficial treatment of the qualified immunity framework, King fails to carry her burden to show that every reasonable deputy would have known

the force used here was unlawful. Brett is thus entitled to qualified immunity.

**B. Deputy Olivo**

King's claims against Olivo suffer from the same flaws. She offers only a perfunctory qualified immunity analysis that relies entirely on conclusory statements. (Doc. 117 at 15-17.) Her brief identifies no materially similar case that would have put every reasonable deputy on notice that Olivo's actions during the transport—either the tight restraints or the unsecured transport—were unlawful. (*Id.*) And the obvious clarity exception offers no lifeline either. The legal landscape governing the acceptable level of force when transporting a suspect is murky at best, and outright unfavorable at worst. *See, e.g.*, *Poulin v. Jeter*, No. 608-CV-299-ORL-31KRS, 2010 WL 3701384, at *12 (M.D. Fla. Sept. 15, 2010) ("[T]he Eleventh Circuit has determined that transporting prisoners in vans without seatbelts does not amount to a constitutional violation."); *Bilal v. Geo Care, LLC*, 981 F.3d 903, 913-14 (11th Cir. 2020); *cf. Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999). Because King has not shown that Olivo's conduct falls clearly outside the law, he is also shielded by qualified immunity.

**IV. Conclusion**

Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Defendants fall into neither category.

Because King cannot point to clearly established law prohibiting the force used in the clinic or her transport, Defendants are shielded from suit. Accordingly, it is **ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 107) is **GRANTED** and the remaining claim against them (Count II) is **DISMISSED**.

2. The Clerk is directed to terminate Deputy Jay Brett and Deputy Malquias Olivo as parties. Because other claims remain pending against the surviving defendants, the Court will withhold judgment until the conclusion of the case. *See* Fed. R. Civ. P. 54(b).

**ENTERED** in Fort Myers, Florida on August 4, 2026.

Kyle C. Dudek
United States District Judge